# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

TISEN K. WASHINGTON,

     Petitioner,

v.                                   Case No. 8:19-cv-542-KKM-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

## ORDER

Tisen K. Washington, a Florida prisoner, timely[1] filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction based on an alleged trial court error and failings of his trial counsel. (Doc. 1.) Having considered the

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). The state appellate court affirmed Washington's conviction and sentence on September 16, 2015. The judgment became final 90 days later, on December 15, 2015, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). Sixty-five days later, on February 19, 2016, Washington filed a petition in state court alleging ineffective assistance of appellate counsel. The petition was denied on April 13, 2016. After 130 days, on August 22, 2016, Washington filed a motion for postconviction relief, which tolled the limitation period until the mandate issued from the appellate court affirming the denial of relief on January 25, 2018. Before that date, on January 19, 2018, Washington filed a motion to correct an illegal sentence. The motion remained pending until the mandate issued on November 13, 2018. Another 105 days later, on February 27, 2019, Washington filed his § 2254 petition. A total of 300 days of untolled time elapsed. The petition is therefore timely.

petition (*id.*), the response in opposition (Doc. 9), and Washington's reply (Doc. 30), the Court denies the petition. Furthermore, a certificate of appealability is not warranted.

## I.   BACKGROUND

### A. Procedural History

A state jury convicted Washington of one count of first-degree premeditated murder. (Doc. 9-2, Ex. 1, appellate record pp. 116-17.) The state trial court sentenced him to life in prison. (*Id.*, appellate record pp. 118-21.) The state appellate court per curiam affirmed Washington's conviction and sentence. (Doc. 9-3, Ex. 5.)

Washington moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 9; Doc. 9-4, Ex. 11.) The state postconviction court summarily denied relief. (*Id.*, Ex. 12.) The state appellate court per curiam affirmed the order of denial. (*Id.*, Ex. 15.)

### B. Factual Background[2]

On September 17, 2008, Jack LaGrand was found shot to death in his taxi in Clearwater, Florida. (Doc. 9-3, Ex. 1, pp. 208, 213-15, 229.) LaGrand's body had been moved partway out of the front seat as if someone had tried to pull him out of the taxi, but his shoelaces got caught on the brake pedal. (*Id.*, pp. 248-29.) LaGrand's wallet, which contained no cash, was under his body. (*Id.*, pp. 251, 263.) Police found the taxi's keys in

---

[2] The factual background is based on the trial transcript, unless otherwise noted.

2

a ravine about 150 to 200 yards north of the parking lot where the taxi was located. (*Id.*, p. 267.) A bullet and shell casing recovered from the taxi were specific to a Russian-made firearm that used Russian-made ammunition. (*Id.*, pp. 421-22.)

LaGrand picked up his last fare from a bar called Fat Daddy's at 1:27 a.m. (*Id.*, p. 355.) The bartender stated that a man came into the bar at some point after midnight and that she complied with the man's request to call a taxi for him. (*Id.*, p. 298.) Surveillance video from the bar showed the person who asked for the taxi wearing a distinctive t-shirt depicting a skull and bones. (*Id.*, pp. 278, 282-83, 362-63.) Surveillance video from Aaron's Rental, which was near the parking lot where the taxi was eventually found, showed the taxi pulling into the lot at 1:29 a.m. (*Id.*, pp. 278-79, 364-65.) The Aaron's video showed a person wearing the same distinctive shirt exiting the rear passenger's seat, going to the driver's door, running around the car, and wiping the car with his hand under his shirt. (*Id.*, pp. 368-72.) The person then fled to the north. (*Id.*, p. 369.) Detective Kerri Spaulding purchased the same type of shirt from an Anchor Blue store in Countryside Mall, the only stores that sold that design. (*Id.*, pp. 290-92.)

Police initially had no leads and the case went cold for several years, but police later developed Washington as a potential suspect. (*Id.*, pp. 284, 372.) On July 18, 2013, Detective Thomas Dawe and Detective Hodgson of the Clearwater Police Department interviewed Washington in jail, where he was housed following his arrest on a drug charge.

(*Id.*, p. 373.) The interview was video-recorded, and a portion of the video was played at trial. (*Id.*, p. 375.)

At the beginning of the interview, police informed Washington of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and he said he understood them. (*Id.*, p. 373.) The detectives did not initially tell Washington that they wanted to ask him about the murder. (*Id.*, pp. 373-74.) Detective Dawe testified at trial that Washington wanted to be a police informant, and that for the first 55 minutes of the interview, the detectives talked to him about cases and matters other than the murder. (*Id.*, pp. 427-28.)

Then, the detectives told Washington that that they believed he might be able to help them regarding a murder that occurred in 2008. (*Id.*, pp. 374, 376.) The detectives told Washington they knew LaGrand picked him up at Fat Daddy's and that they verified he was in LaGrand's taxi through DNA testing. (*Id.*, pp. 378, 380-81.) Initially, the detectives told Washington that LaGrand was killed after he dropped Washington off and they were trying to determine who got into the taxi next. (*Id.*, p. 377-80.) Washington stated that he remembered a woman getting into the taxi after it dropped him off. (*Id*, pp. 385, 394-95.)

Washington identified himself as the person in the bar video. (*Id.*, pp. 383-84, 411-13.) He recognized the bartender and also recalled that the taxi driver was an older

gentleman. (*Id.*, pp. 395-96, 411.)[3] When police showed Washington the shirt that Detective Spaulding had purchased, he agreed he was wearing a shirt like that one. (*Id.*, p. 382.) Although at one point Washington stated that he thought his shirt was a different color, he later agreed that his shirt was exactly like the one police showed him. (*Id.*, pp. 389-91.) Washington stated he bought the shirt from a store inside Countryside Mall. (*Id.*, p. 389-90.)

The detectives then informed Washington that he was the suspect. They showed him the Aaron's video and told him that when he tried to wipe down the cab, he missed something. (*Id.*, pp. 404-05.) They told Washington that they knew his descriptions of what happened were not true, that they knew the taxi went directly from Fat Daddy's to the parking lot, that they found a fingerprint on the taxi keys, and that they believed this was a robbery that went bad. (*Id.*, p. 404-07.) After police showed him the Aaron's video, Washington denied that he was the person in that video. (*Id.*, p. 407.)

Detective Dawe testified that, in a part of the interview not shown to the jury, Washington made statements indicating that he thought he might have been in a different bar that night. (*Id.*, p. 421.) Additionally, Detective Dawe testified, while Washington was talking to the detectives about other people he knew, he stated that one of his friends had

---

[3] One of the responding officers testified that LaGrand appeared to be in his fifties. (Doc. 9-3, Ex. 1, p. 248.)

access to a Russian firearm. (*Id.*, p. 422.) Detective Dawe acknowledged that police did not in fact have any DNA or fingerprints connecting Washington to the crime. (*Id.*, pp. 418-19, 453.)

Anthony Harris, who was housed in the jail with Washington at the time of the police interview, testified at trial. Harris stated that, when Washington returned from the interview, he "looked like he had seen a ghost" and said that police had just questioned him about a murder of a taxi driver he had committed in September 2008. (*Id.*, pp. 337-38.) Washington told Harris that police said they had his fingerprints and DNA. (*Id.*, p. 339.) He also told Harris that he came into contact with the taxi driver at "Fatty's." (*Id.*, p. 338.) Washington said police showed him a video of himself running around the cab, and that they had the same kind of shirt he was wearing when he committed the murder. (*Id.*, pp. 338-39.) Harris said that Washington explained he got $1,000 from the taxi, that he wanted the money to buy drugs to sell, and that he murdered the driver because he did not want a witness. (*Id.*, pp. 339-40.) Washington had planned to take the taxi but it proved too difficult because the victim's body was in the way, so he fled on foot instead. (*Id.*, p. 339.) Washington said that he was going to call his cousin and ask his cousin to say that the taxi dropped him off earlier. (*Id.*, p. 338.)

6

II.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief

under the AEDPA can be granted only if a petitioner is in custody "in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d)

provides that federal habeas relief cannot be granted on a claim adjudicated on the merits

in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal

law "if the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the Supreme]

Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,

413 (2000). The phrase "clearly established Federal law" encompasses the holdings only of

the Supreme Court of the United States "as of the time of the relevant state-court decision."

*Id.* at 412. A decision involves an "unreasonable application" of clearly established federal

law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

For purposes of § 2254(d)(2), a state court's findings of fact are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct . . . ."). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly

established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* The state may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Washington brings several claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on

10

claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. ANALYSIS

### A. Ground One

Washington argues that the trial court erred in denying his motion to suppress his statement to police. He claims that his statement was obtained in violation of his rights as set out in *Miranda*, resulting in a denial of his constitutional rights to a fair trial and equal protection.

Washington's pre-trial motion to suppress alleged that police failed to obtain from him a knowing, intelligent, and voluntary *Miranda* waiver before questioning. Washington claimed that he was led to waive his rights "under the deception of providing information to police on other cases of which he was not involved or implicated," which would "help him to work out a deal on his pending drug case." (Doc. 9-2, Ex. 1, appellate record pp. 32, 35.) He also claimed that Detective Dawe undermined the seriousness of the interview when obtaining a waiver from Washington. (*Id.*, appellate record pp. 36-37.) Washington asserted he "had no way to knowingly and intelligently waive his right to remain silent, when he agreed to speak to police under the false pretense of providing information to help on his pending drug case." (*Id.*, appellate record p. 38.) He further asserted that the alleged

11

inducement of his *Miranda* waiver violated his federal due process rights. (*Id.*, appellate record pp. 33, 35-39.)

Detective Dawe was the only witness at the suppression hearing. While Washington was in the Land O' Lakes Jail in Pasco County in 2013, Detective Dawe learned Washington had been cooperating with Detective Elders of the Pasco County Sheriff's Office and providing information to Detective Elders on a voluntary basis. (Doc. 9-2, Ex. 1, appellate record pp. 295-97.) Washington told Detective Elders that he had information about events in Clearwater and agreed to talk to law enforcement from Clearwater. (*Id.*, appellate record p. 298.) Accordingly, Detective Dawe and Detective Hodgson interviewed Washington in the library at the Land O' Lakes Jail. (*Id.*, appellate record pp. 295, 301.) Detective Dawe did not mention the "nature" of the interview or tell Washington that he was a suspect in a crime when the interview started. (*Id.*, appellate record p. 323.)

Detective Dawe described the library as a "rather large room with shelves and books and tables." (*Id.*, appellate record p. 301.) The interview occurred "in the tables and chairs area." (*Id.*) Detective Dawe described the door to the library as "just a normal door that opens in." (*Id.*, appellate record pp. 301-02.) The door was propped open with a book. (*Id.*, appellate record p. 304.) The detectives were dressed in suits, shirts, and ties. (*Id.*, appellate record p. 311.) The interview lasted about two hours. (*Id.*, appellate record p. 302.)

Detective Dawe testified that Washington was not handcuffed or restrained before or during the interview. (*Id.*, appellate record p. 303.) Detective Dawe offered Washington food and water and told him that he could walk around and he was free to leave the library. (*Id.*, appellate record p. 304.) Detective Dawe testified that Washington never said he wanted to leave and that he expressed a desire to talk. (*Id.*, appellate record p. 305.) Detective Dawe read Washington his *Miranda* warnings within the first few minutes of the interview. (*Id.*) Washington told Detective Dawe that he understood his rights and was willing to talk. (*Id.*, appellate record p. 307.) Washington acknowledged that he had previously had *Miranda* warnings read to him. (*Id.*) Washington also signed a waiver form. (*Id.*) Detective Dawe told Washington that signing the waiver form was "a formality." (*Id.*, appellate record pp. 309-10.)

Detective Dawe testified that he never threatened Washington or promised him anything. (*Id.*, appellate record pp. 310-11.) Nor did he tell Washington that he would obtain any benefit in his pending drug case by speaking to police. (*Id.*, appellate record p. 311.) Detective Dawe testified that he and Detective Hodgson were not armed and did not use intimidation or deception to obtain Washington's waiver of his rights. (*Id.*) About an hour into the interview, Detective Dawe told Washington that he believed Washington could help with a 2008 case involving the murder of a taxi driver and they began discussing

the murder case, as addressed above in the factual background. (*Id.*, appellate record pp. 312-13.)

The state trial court denied Washington's motion to suppress. First, the court found that Washington "was not in custody, for *Miranda* purposes, for the murder of" the victim. (Doc. 9-2, Ex. 1, appellate record p. 103.) The court found that Washington was interviewed in the jail's library, was not restrained or threatened, and was not offered anything by detectives, who were in plain clothes. (*Id.*) The court also found that "[a]s the interview started, Mr. Washington was told the door was unlocked and he could leave at any time." (*Id.*)

Alternatively, the court found that Washington's decision to waive his rights was knowing and intelligent. The court noted that Washington was read his *Miranda* rights and signed a written *Miranda* form at the beginning of the interview and that Washington was familiar with his *Miranda* rights based in earlier unrelated cases. (*Id.*) The court found that the State had established by a preponderance of the evidence that Washington understood his rights and that his "decision to waive these rights was not critically impaired because of coercive or deceptive police conduct." (*Id.*)

Washington fails to establish that the state court unreasonably denied his claim. *Miranda* holds that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

14

defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'").

To determine whether a suspect was in custody, a court considers the totality of the circumstances surrounding the interrogation. *Stansbury v. California*, 511 U.S. 318, 322 (1994). A court considers "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted); *see also United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (stating that whether a suspect was in custody and thus entitled to *Miranda* warnings depends on "whether under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave") (internal quotation marks and citation omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."

*Moya*, 74 F.3d at 1119. "[U]under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *Id.*

That the interview subject is an inmate does not render the questioning custodial. The Supreme Court has "repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial." *Howes v. Fields*, 565 U.S. 499, 505 (2012). "[S]tandard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation. Thus, service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.* at 512.

Washington does not show that the state court unreasonably determined he was not "in custody" for *Miranda* purposes. As addressed, if a person is not "in custody," police are not required to provide *Miranda* warnings or obtain a *Miranda* waiver. Washington was not restrained and was informed he could leave when he was interviewed in the library, which was a large room with the door open. In addition, Washington was not offered or promised anything and was not threatened by the detectives. Considering the totality of these circumstances, Washington does not demonstrate that a reasonable innocent person would not have felt free to terminate the interview. *See Thompson*, 516 U.S. at 112; *Moya*,

16

74 F.3d at 1119. Thus, he does not show that the state court unreasonably denied his motion to suppress on the basis that he was not in custody for *Miranda* purposes.

To the extent the state trial court implicitly found Detective Dawe's testimony credible by relying on his testimony in ruling on the suppression motion, that credibility determination is a factual finding that is presumed correct. *See* 28 U.S.C. § 2254(e)(1). Washington has not rebutted the presumption of correctness by clear and convincing evidence. *See id.*

Nor does Washington show that the court's alternative basis for denying the motion—that the *Miranda* waiver was valid—was unreasonable. *Miranda* requires a waiver to be made "voluntarily, knowingly and intelligently." 384 U.S. at 444. The waiver of *Miranda* rights must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707 (1979)).

Washington alleges that police misrepresented the purpose of the interview and did not inform him that he was a suspect in the murder. But he does not allege that the detectives mispresented the law or otherwise misled him about the *Miranda* rights he was waiving when agreeing to speak with them. Police misrepresentations of fact, as opposed to misrepresentations of law, generally do not invalidate a *Miranda* waiver. *See United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (stating that misrepresentations of fact do not "undermine the waiver of the defendant's *Miranda* rights" whereas misrepresentations of law "on the other hand, are much more likely to render a suspect's confession involuntary"); *see also United States v. Becker*, 762 F. App'x 668, 673 (11th Cir. 2019) (stating that "misrepresentations of fact are not enough . . . to undermine a suspect's *Miranda* waiver"). Washington is simply arguing that he lacked foreknowledge that police would ask him questions about the 2008 murder, but that does not render his waiver unknowing or involuntary.

This general principle applies to both withholding information and to providing inaccurate information. "Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right—'his right to refuse to answer any question which might incriminate him.'" *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (quoting *United States v. Washington*, 431 U.S. 181, 188 (1977)). Withholding information from a suspect "is only relevant to the constitutional

validity of a [*Miranda*] waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 423-24.

Similarly, affirmative misrepresentation by the police about the subject matter of an interrogation does not make an individual's *Miranda* waiver involuntary. *See United States v. Farley*, 607 F.3d 1294, 1327-28 (11th Cir. 2010) (finding *Spring*'s analysis "compelling" in a case involving affirmative misrepresentation and stating that *Spring*'s "distinction between 'constitutionally significant' information about the nature of the right being waived, and information that merely affects the 'wisdom' of the decision to waive, makes sense regardless of whether there is a failure to convey information or a communication of misinformation" (quoting *Spring*, 479 U.S. at 576-77)). The suspect in *Farley* was properly warned under *Miranda* that "anything" he said could be used against him, and there was no indication that he "was unsure of his rights or needed them clarified." *Id.* at 1329-30. Thus, police deception was not constitutionally significant because it "did not prevent Farley from understanding the nature of his rights and the legal consequences of waiving them." *Id.* at 1328.

Washington does not show that withholding or misrepresenting factual information affected the validity of his *Miranda* waiver. While Washington makes a conclusory and vague assertion that the waiver could not have been voluntary because he did not know why

19

detectives wanted to question him, he does not argue that he lacked understanding of the warnings or that the warnings were inadequate to convey to him his rights as required by *Miranda*. Nor does Washington assert that he was threatened or coerced by police, or promised anything if he agreed to talk.

Washington also claims that Detective Dawe undermined the seriousness of *Miranda* by minimizing the importance of the waiver form. A transcript of the interview shows that Detective Dawe told Washington that police needed to "have a Consent Form signed for you that you're willing to talk to us." (Doc. 9-2, Ex. 1, appellate record p. 44.) Detective Dawe then confirmed that Washington had his rights read to him before and that Washington understood the rights before they began. (*Id.*) Detective Dawe stated, "Okay. This is just a form here. It's got several different things on here. I'm gonna cross out a few 'cause a lot of them don't have anything to do with us. It's a pretty generic form." (*Id.*) He then recited *Miranda* warnings to Washington, who stated that he understood the rights and was willing to talk. (*Id.*) Detective Dawe then stated, "Okay. Can I just get a signature there? I appreciate it. It's a formality we gotta go through." (*Id.*) Washington has not established that Detective Dawe's presentation of the form affected he validity of his waiver. He does not establish that it impacted his understanding of the *Miranda* rights or the consequences of waiving them. In particular, he does not show that Detective Dawe's comment that obtaining a signature was a "formality,"—a comment made after

20

Washington had been read his rights and had verbally acknowledged his understanding and waiver of those rights—affected the knowing and intelligent nature of the waiver.

Washington fails to show that he lacked "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 412 U.S. at 421. Rather, considering the totality of the circumstances, the record supports the conclusion that Washington comprehended his rights and the consequences of waving them, and that he made an uncoerced choice to waive his rights. *See id.* Any misinformation or lack of information identified by Washington was not constitutionally significant to the waiver of his rights under *Miranda*.

Nor does Washington show that the interrogation tactics police used in his interview resulted in a substantive due process violation. "Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003). "[T]he official conduct 'most likely to rise to the conscience-shocking level' is the 'conduct intended to injure in some way unjustifiable by any government interest.'" *Id.* at 775 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). But Washington does not show that the identified actions of police during the interview rise to this level.

Washington has not demonstrated that the state court's denial of his motion to suppress was contrary to or involved an unreasonable application of clearly established federal law, or that it was based on an unreasonable factual determination. He is not entitled to relief on Ground One.

## B. Ground Two

Washington argues that trial counsel was ineffective for not moving to introduce at trial redacted portions of the interrogation video. Washington contends that he "inadvertently admitted" that he was at Fat Daddy's but that the redacted portions show he thought he was at another bar called Buster's. (Doc. 1, p. 8.) Washington asserts that because the redacted portions would have clarified his admissions to police and tended to exonerate him, their omission denied the jury "an opportunity to weigh all of the facts and have a complete view of the evidence, thereby depriving the Petitioner of his right to a fair trial." (*Id.*, p. 9.)

The state postconviction court rejected Washington's claim. The court noted that the recording was redacted "to remove any irrelevant information or prejudicial statements that the Defendant made, including statements related to the Defendant's gang activity."

(Doc. 9-4, Ex. 12, p. 4.)[4] Therefore, the court found, Washington failed to show that his attorney performed deficiently in not seeking to introduce the redacted portions. (*Id.*)

Additionally, the court found that Washington did not show prejudice from counsel's failure to present the entire video. First, the court noted that counsel did argue Washington only identified himself because he thought he was at Buster's, not at Fat Daddy's. (*Id.*) The court also found that Washington failed to show prejudice considering the "significant additional evidence presented against [him] at trial," including: Washington's statement that he remembered the bartender at Fat Daddy's; Washington's acknowledgment that he owned a shirt like the one depicted in the Fat Daddy's surveillance video; Washington's acknowledgment that he called for a cab that night from the bar and the driver was an older gentleman; Washington's identification of himself in the surveillance video from Fat Daddy's the night of the murder; evidence that the suspect from Fat Daddy's was the last fare the victim picked up before he was killed; evidence that the bullet casing found in the vehicle was from a Russian firearm and Washington told

---

[4] The court cited to portions of the trial transcript where the trial court and the attorneys spoke outside of the jury's hearing. The State explained that "he goes on all about his gang activity in the remainder of that video, and that's part of the reason we didn't play it." (Doc. 9-3, Ex. 1, p. 436.) The State also agreed when the Court stated, "The entire video . . . wasn't shown because it's not relevant to this case and it would be highly prejudicial. I assume that the Defense and the State agree that the portions weren't shown shouldn't be shown because they are either not relevant or they are highly prejudicial and not relevant or something like that. The rest of it wasn't shown, at least in substantial part I assume because it would be unduly prejudicial to the Defense; is that not right?" (*Id.*, pp. 437-38.)

police that his friend had a Russian firearm; the surveillance video from Aaron's Rentals; and the testimony of jailhouse informant Anthony Harris. (*Id.*, pp. 4-5.)

Washington does not show entitlement to relief. First, he fails to show that the state court unreasonably determined that counsel did not perform deficiently by not moving to introduce the redacted portions of the video when they contained irrelevant and prejudicial information. Nor has Washington shown that the state court unreasonably rejected his argument of *Strickland* prejudice. As the state court indicated, counsel did not need the entire video to argue that Washington believed he was at Buster's. On cross-examination, Detective Dawe testified that Washington talked about a bar on 580 across from K-Mart during the interview. (Doc. 9-3, Ex. 1, p. 433.) The defense and State stipulated to the introduction of a map showing Buster's across the street from K-Mart. (*Id.*, pp. 514-15.) In closing argument, counsel asserted that Washington hesitated in his responses to police about his location and "never does say for sure it's Fat Daddy's," that he was talking "about a place on 580 across from K-Mart," and that the map indicated Washington was thinking of another bar. (*Id.*, p. 540.)

In addition, as the state court's order sets out, the prosecution presented significant evidence of Washington's identity as the perpetrator. Washington fails to show a reasonable probability of a different outcome had the entire video been played to support his theory that he believed he went to a different bar the night of the murder. Washington

has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. Consequently, he is not entitled to relief on Ground Two.

### C. Ground Three

Washington argues that trial counsel was ineffective for not objecting to prosecutorial misconduct regarding phone calls he made from the jail. Although the calls were not introduced into evidence, Detective Dawe referenced them in describing his investigation and stated that they did not contain incriminating information. (Doc. 9-3, Ex. 1, p. 425.) Washington claims that, while the State argued that the phone calls had no evidentiary value to the case, the defense argued that Harris overheard him talking on the phone and that "[t]he knowledge Anthony Harris shared was a direct result of ease [sic] dropping, local media, and inferences based on rumors" as opposed to a confession by Washington. (Doc. 1, p. 11.)[5]

---

[5] In opening statements, counsel asserted when Washington called his family to tell them about the interview, Harris was "sitting there listening." (Doc. 9-3, Ex. 1, p. 206.) Counsel cross-examined Harris about the jail phones, eliciting Harris's testimony that the phones were popular and were situated side-by-side. (*Id.*, pp. 341, 345.) But Harris denied that one inmate could overhear another inmate's conversation. (*Id.*, pp. 345-46.) While counsel noted in her closing argument that Washington did not make the incriminating call to his cousin that Harris claims Washington intended to make, counsel did not contend that Harris eavesdropped on Washington's phone calls or otherwise argue how Harris obtained information. (*Id.*, pp. 531-46.)

First, Washington contends that the prosecutor's elicitation of information about the calls during Detective Dawe's direct examination was improper because the calls were not admitted into evidence. Detective Dawe testified:

Q.   Now, are you aware of whether or not calls placed - - telephone calls placed by inmates in the Land O' Lakes jail are recorded?

A.   Yes, they are.

Q.   As part of your investigation did you listen to recorded conversations made by Tisen Washington?

A.   Yes, I did. Since - -

Q.   Explain to the jury why you might do something like that.

A.   We try to monitor the phone calls, mail, and any visitations. I listened to at least 90 phone calls where he used his PIN number to call people. They are about 20 minutes - - 15 to 20 minutes on average, 11 video visitations which are about an hour apiece and the mail.

Q.   During any of those phone calls does Tisen Washington give any of the details of his case that you discussed with him during his interview?

A.   Very limited. He just mentioned that the detectives came and talked to him. He mentioned that they mentioned that they had prints and DNA. That's really it. Most of the people they [sic] talked to kept emphasizing stop talking about the case.

(Doc. 9-3, Ex. 1, p. 425.) The state trial court sustained defense counsel's hearsay objection. (*Id.*, pp. 425-26.) The prosecution did not ask Detective Dawe any more questions about the jail calls. (*Id.*, pp. 426, 466.)

Washington also contends that the prosecutor made improper comments about the jail calls during closing argument. In closing arguments, defense counsel argued that Harris's testimony was unreliable. In particular, counsel suggested it was not credible to think that Washington confessed to Harris yet said nothing incriminating in over 90 jail phone calls. (Doc. 9-3, Ex. 1, pp. 537-38.)[6] She also noted that while Harris testified that Washington said he was going to call his cousin to provide an alibi, Washington made no such call. (*Id.*, p. 538.) During rebuttal closing argument, the prosecutor noted that the defense addressed the jail calls and argued:

> We acknowledge the jail calls are all recorded. There were no details in any of those jail calls that the defendant made about the facts of his case, this case. Then ask yourself how else would Anthony Harris know the details that he gave to law enforcement? His mouth.

(Doc. 9-3, Ex. 1, p. 555.)

---

[6] Counsel asserted, "Detective Dawe told you he's listened to over 90 recordings. And I promise you that if the State had one of those recordings that had any indication that Tisen Washington was talking about anything having to do with this crime that implicated him, you would have heard it in this courtroom, and you didn't because there wasn't." (Doc. 9-3, Ex. 1, p. 538.)

The state postconviction court denied Washington's ineffective assistance claim. The court found that counsel did not perform deficiently by not objecting to Detective Dawe's testimony on the basis that the calls were not admitted into evidence. (Doc. 9-4, Ex. 12, p. 7.) The court noted that Detective Dawe testified that he listened to jail recordings as part of his investigation but that Washington did not give details of his case on the calls (aside from stating that "they" had his DNA and fingerprints), and that the state trial court sustained counsel's hearsay objection. (*Id.*) The court also found that Washington failed to demonstrate deficient performance for not objecting to the prosecutor's closing argument. (*Id.*) The court found that in context, the statement was a proper comment on Harris's credibility and was not improper bolstering because the prosecutor made a reasonable inference from the evidence. (*Id.*) Finally, the court determined that Washington failed to show *Strickland* prejudice as "[b]oth the State and defense counsel argued at trial that none of the jail calls contained any incriminating evidence as to the Defendant." (*Id.*, pp. 7-8.)

Washington does not show that the state postconviction court unreasonably denied his claim. He does not establish that counsel performed deficiently in not objecting to questioning about the jail calls when Detective Dawe conceded that the calls were not incriminating. Nor does Washington show that counsel performed deficiently in not objecting during the State's closing argument. As the state postconviction court noted, a

28

prosecutorial statement must be evaluated in context. *See United States v. Hall*, 47 F.3d 1091, 1099 (11th Cir. 1995) ("Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record." (citing *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir. 1990))). A prosecutor may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). "Additionally, 'the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel.' " *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) (quoting *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984)). But it is improper for a prosecutor to bolster a witness's testimony by vouching for the witness's credibility. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1313 (11th Cir. 2010). Bolstering occurs when the prosecutor "plac[es] the prestige of the government behind the witness" or "indicat[es] that information not before the jury supports the witness's credibility." *Id.* at 1313-14.

Considering the comment in context, the prosecutor was responding to the defense's contention that Harris lacked credibility by arguing that, because the jail calls contained no incriminating evidence, Harris must have learned of information about the crime directly from Washington, as Harris testified. Thus, the identified remark was a permissible response to the defense and was a permissible argument about a conclusion the prosecutor believed the jury should draw from the evidence admitted at trial in evaluating Harris's

credibility. The record therefore supports the state court's conclusion that the prosecutor's statement was proper when considered in context and counsel was not deficient for failing to object to it.

Lastly, the state court did not unreasonably apply *Strickland*'s prejudice prong in denying Washington's claim. Washington does not show a reasonable probability of a different outcome had counsel objected when, as the court noted, it was clear that the calls did not incriminate Washington. As Washington does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, Washington is not entitled to relief on Ground Three.

### D. Ground Four

Washington argues that trial counsel was ineffective for failing to investigate and present his booking photo "or to have [him] display his deformed earlobes as exculpatory evidence during at [sic] trial." (Doc. 1, p. 12.) Washington represents that "[a] bulbous scar tissue . . . protrudes for [sic] the earlobe." (Doc. 1, p. 13.) Washington contends that this evidence would have cast doubt on his identity. He asserts that the video from Fat Daddy's showed the suspect wearing earrings, which he cannot do because of his deformity. He also states that despite the deformity on his earlobe, the bartender testified that she did not notice anything unusual about the person who asked for a cab. (*See* Doc. 9-3, Ex. 1, p. 298.)

The state postconviction court denied Washington's claim. The court noted that the parties did not agree whether the video showed the suspect wearing earrings. (Doc. 9-4, Ex. 12, p. 8.)  The court therefore found Washington's claim speculative "that because he could not wear earrings, showing the jury his earlobes would have exonerated him." (*Id.*) The court also stated that the jury was shown a photo depicting Washington's ear when the State introduced a photopack containing Washington's picture, and that defense counsel "noted on the record that the picture displays the Defendant's deformity on his ear." (*Id.*) The court found that "because the jury was able to view a photo of the Defendant identifying his deformed earlobe, the Defendant fails to establish that he suffered prejudice." (*Id.*)

Washington does not show entitlement to relief. As the state court noted, the defense agreed that the photopack showed the deformity on Washington's ear. (Doc. 9-3, Ex. 1, p. 546.) Counsel argued that comparing that photo to the bar video showed that the person in the bar was not Washington. (*Id.*, pp. 545-47.) Whether the video showed the suspect wearing earrings was debated at trial and was a factual question for the jury's resolution. The defense maintained that the video showed the suspect wearing earrings because there was a reflection of light on the suspect's ear. (*Id.*, pp. 544-47.) The prosecution disagreed; it asked the jury to determine whether the video showed an earring

or a showed a deformity, asserting that "this is a night vision camera in a dark bar." (*Id.*, p. 563.)

The state court did not unreasonably find that Washington failed to show prejudice due to counsel's performance when a photo that depicted the deformity on his ear was already before the jury. Nor did the state court unreasonably determine that Washington's claim was too speculative to warrant relief, as Washington has not established a reasonable probability that providing the jury a different view of his ear would have changed the outcome of the proceeding. *See, e.g.*, *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim). Because Washington does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Four.

### E. Ground Five

Washington asserts that trial counsel was ineffective for not filing a pre-trial motion to suppress the t-shirt Detective Spaulding purchased. He asserts that the shirt was "presented at trial as the actual shirt used by the perpetrator." (Doc. 1, p. 14.) Washington argues the shirt was not relevant since it was "not the shirt worn by the killer." (*Id.*, p. 15.) Washington contends that the introduction of the shirt allowed the State to "make an

inference of the Petitioner's guilt[ ] to the members of the jury by making a connection with the murder of Jack LaGran[d] and that shirt, although that particular shirt had nothing to do with the crime." (*Id.*) Washington also contends that the shirt's introduction led to an improper prosecutorial comment about his reaction to it during the interview. (*Id.*)

The state postconviction court denied Washington's ineffective assistance claim. The court found Washington's assertion meritless that the shirt was not relevant to his case. (Doc. 9-4, Ex. 12, p. 9.) The court explained that both video recordings showed the suspect wearing a unique shirt depicting a skull and bones; that detectives purchased a shirt from Countryside Mall that appeared to match the suspect's shirt; and that when police showed Washington the shirt, he indicated that he had the same shirt, that he wore it the night he called the cab from the bar, and that he bought it at Countryside Mall. (*Id.*) Having concluded that the shirt was relevant, the court found that counsel was not ineffective for failing to file a meritless motion. (*Id.*)

Washington does not show entitlement to relief. Contrary to Washington's assertion, the shirt introduced into evidence was not portrayed as the very shirt the suspect wore during the crime. Rather, as the state court noted, it was apparent from the record that Detective Spaulding had purchased the shirt at the mall because she believed it to match the suspect's shirt as depicted in the videos. (Doc. 9-3, Ex. 1, pp. 282-84, 289-92.)

And the detectives told Washington during the interview that the shirt was not actually his or the one the suspect wore. (*Id.*, p. 382.) In addition, as the state court noted, when detectives showed him the shirt during the interview, Washington agreed that he had the same shirt, that he bought it at the mall, and that he wore it the night he took the taxi. (*Id.*, pp. 382-83, 389-91.) While Washington asserts that the shirt's introduction allowed the prosecutor to make an improper comment, he does not establish that any comment made at trial was a basis for a pre-trial motion to suppress the shirt.[7]

Washington does not show that the court unreasonably found that the shirt was relevant and that counsel was not ineffective for failing to file a meritless motion to exclude it.[8] *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."). Washington has not shown that the state court unreasonably applied *Strickland* or

---

[7] Washington does not raise an independent claim of federal constitutional error regarding the prosecutor's comment.

[8] To the extent the resolution of Washington's ineffective assistance claim implicitly relies on an application of Florida evidentiary law governing whether evidence is relevant and admissible, this Court must defer to the state court's determination that a motion to suppress the evidence would have been without merit. *See Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))).

unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Five.

### F. Ground Six

Washington claims that he is entitled to relief based on the cumulative effect of trial counsel's alleged errors. The state postconviction court denied this claim because "where the alleged errors urged for consideration in a cumulative error analysis are individually either procedurally barred or without merit, the claim of cumulative error also necessarily fails." (Doc. 9-4, Ex. 12, p. 11.) Washington does not show that the state court's finding was contrary to, or involved an unreasonable application of, clearly established federal law. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (stating that when none of the individual claims of error have merit, "we have nothing to accumulate"). Washington is not entitled to relief on Ground Six.

## V.   CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Washington must show that reasonable jurists would find debatable both the merits of the underlying claims and

the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Washington has not made the requisite showing. Finally, because Washington is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Washington's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Washington and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida on March 23, 2022.

Kathryn Kimball Mizelle
United States District Judge